IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD ROSS | : | CIVIL ACTION |
| | : | |
| v. | : | No. 12-2631 |
| | : | |
| CONTINENTAL TIRE OF AMERICAS, LLC., et al. | : | |

MEMORANDUM

**Juan R. Sánchez, J.**                                                                            April 16, 2013

      Plaintiff Ronald Ross brings this action against his former employer, Continental Tire of Americas, LLC (Continental), and former supervisor, Kevin Gilhuly, alleging violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. Ross alleges Defendants unlawfully interfered with his rights under the FMLA, and retaliated against him for taking FMLA leave. Defendants have filed a motion for summary judgment on all claims. For the following reasons, Defendants' motion will be granted.

**FACTS[1]**

      Continental hired Ross on February 4, 2008, as a Car Dealer Business Development Manager. In 2010, Continental changed its organizational structure, and Ross became an Area Dealer Manager. In February 2011, Ross was promoted to Area District Manager-3 (ADM3), the highest field sales position with Continental, resulting in an increase in his responsibilities. Following his promotion, Ross began reporting directly to Gilhuly, a Regional Manager.

      In the summer of 2011, Gilhuly reported problems with Ross's performance to Gabrielle Alexander in Continental's Human Resources (HR) Department. On August 17, Gilhuly,

---

[1] "On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

Alexander, and other personnel reviewed Ross's performance during a Human Resource Development Meeting. There was discussion at the meeting regarding Ross's difficulty with his largest client, Reliable Tire, including the fact that Rich Betz, the owner of Reliable Tire, had told Gilhuly he believed Ross did not understand his business and was not adding value to it. Based on Ross's difficulties with this client and other perceived deficiencies, Ross was given a rating of "not meeting expectations." As a result of this rating, Continental developed a performance improvement plan (PIP) for Ross, to make him aware of his areas of deficiency.[2] Gilhuly drafted the PIP in consultation with Alexander and another HR employee, Amanda Powell. Ross first learned of the impending PIP in September 2011, when he asked Gilhuly about his job performance. Gilhuly informed Ross he was not meeting expectations and a PIP was in progress without providing further detail. Gilhuly informed Alexander of this conversation.

On October 11, 2011, Gilhuly told Ross he wished to meet with him the following morning to conduct his annual review and, after the review, Ross would meet with HR to go over his PIP. In response to this conversation, Ross prepared a memorandum, of his own accord, outlining a six-month plan of action that acknowledged his deficiencies and highlighted ways to improve his performance. Ross sent this memo to Gilhuly in advance of their meeting. The next morning, Ross and Gilhuly met for Ross's annual review. Gilhuly identified specific areas for improvement, including program understanding, analytical skills, call preparation, meeting more frequently with key customers, financial analysis, communicating clear and concise messages during sales calls, and better preparation. Gilhuly advised Ross his overall performance evaluation rating was "does not meet expectations."

---

[2] Continental sometimes refers to the PIP as a Performance Improvement Action Plan (PIAP).

Later in the morning on October 12, Ross met with Gilhuly and Powell to review his PIP. The PIP consisted of a memorandum from Gilhuly summarizing the areas in which Ross's performance was deficient, and setting forth specific guidelines to address the identified problems. The PIP did not have a set end date. Rather, the PIP stated Continental would "discuss [Ross's] progress against these expectations mentioned above every 30 days for 90 days from the day of issuance [of the PIP]. At that time, [Continental] will review your job performance [and] determine what additional actions, if any, will be necessary." Defs.' Mot. for Summ. J. Ex. L. Thus, it was contemplated the PIP would remain in effect for a minimum of 90 days, with any possible extension dependent on Ross's progress towards meeting the established goals.

On November 6, 2011, Ross sent Gilhuly and Powell an email, advising them he had been diagnosed with prostate cancer. He also informed them he had further testing scheduled for November 9, and would be developing a specific treatment plan as soon as possible. This was the first formal notification to Continental of Ross's illness. Ross spoke with Gilhuly on November 11, providing him with additional information regarding his health status and treatment plan.

On December 5, 2011, Alexander emailed Ross; Gilhuly; Powell; Christ Charity, the National Sales Manager; and Jim Sicking, the Director of Independent Dealer Sales, stating "the company would do everything [it] can to support [Ross] during this time," and noting that "[o]bviously, based on [Ross's] health and treatment plan the PIP timetable may need to be adjusted." Defs.' Mot. for Summ. J. Ex. W. Gilhuly responded to this email the following day, stating "Ron had definitely made progress on most of the areas identified in the PIP. However, there is still work to be done." *Id.* Gilhuly further stated "[he] would have no issue with

adjusting the PIP timetable to give Ron more time to deal with the health issues." *Id.* On December 19, 2011, after receiving an update from Ross, Gilhuly sent Charity and Sicking an email advising them of Ross's treatment schedule, explaining that Ross would be unable to attend the National Sales Conference, and suggesting they consider pushing the PIP timetable back by at least 30 days, such that the PIP would end no earlier than February 10, 2012. Gilhuly forwarded this email to Alexander the next day asking if she agreed with adjusting Ross's PIP end date. On January 1, 2012, Alexander emailed Gilhuly agreeing that the PIP end date should be adjusted.

On December 22, 2011, Ross emailed Gilhuly, Alexander, and benefits coordinator Jean Harvel to advise them of his chosen treatment plan and dates of planned FMLA leave. The next day, Ross emailed Gilhuly asking for clarification regarding the end date of his PIP. Ross requested the PIP end on January 12, 2012, so as to be resolved before he went out on medical leave; however, neither Gilhuly nor anyone else at Continental ever agreed to this request or took any action to conclude the PIP. There is no evidence of a 90-day or final review of Ross's PIP in January 2012.

Ross requested and was granted FMLA leave to begin on January 18, 2012. He returned to work on March 19, 2012. While on leave, Ross continued to receive his regular compensation and insurance benefits. Ross does not contend he failed to receive any benefits to which he was entitled during his leave of absence. He returned to work in the same position he held when he left, ADM3. Because his PIP had not been concluded before his FMLA leave, the PIP remained in place upon his return.

Twice while on leave, on February 17 and 23, 2012, Ross emailed Gilhuly regarding his PIP status. On February 23, Gilhuly responded that the PIP could not be changed or addressed

4

until Ross returned to work full-time. Also during this time period, Ross requested to return to work on light duty with an accommodation of no driving. Ross's request was denied as a significant proportion of his responsibilities involved driving. Alexander told Ross that Continental would await his full medical release before allowing him to return to work.

During the week of March 14, 2012, Gilhuly, knowing Ross was due to return to work on March 19, met with Alexander to discuss the drafting of a PIP Addendum. On April 11, 2012, Gilhuly received approval from HR regarding the Addendum. On April 12, 2012, Ross received a memorandum from Gilhuly entitled "ADM3 Performance-Addendum to October 12, 2011 PIAP," in which Gilhuly stated he was going to delay the final review of Ross's performance against the original PIP for at least 60 days. Gilhuly stated he wanted to provide Ross with time to familiarize himself with the new 2012 programs introduced during his medical leave as well as to provide him time to complete and present his 2012 Territory Plan to the satisfaction of sales management.

Ross filed the instant lawsuit against Continental and Gilhuly on May 14, 2012, alleging his placement on the initial PIP and subsequent Addendum violated his rights under the FMLA. On July 19, 2012, while this lawsuit was pending, Gilhuly provided Ross with a 12-page memorandum summarizing his performance under the original October 12, 2012, PIP and the April 12, 2012, Addendum. In the memorandum Gilhuly addressed in detail the performance deficiencies which prompted the initial PIP, Ross's knowledge the PIP had not been concluded when he went on medical leave, and the deficiencies which continued to exist in Ross's performance following implementation of the initial PIP and the PIP Addendum. The ongoing performance deficiencies listed in the memorandum included Ross's failure to visit specific customers, failure to communicate with customers about their year-end goals, inability to take

initiative and schedule key customer meetings, failure to prepare and conduct customer meetings independent of Gilhuly, provision of incorrect information to customers, and failure to complete his 2012 Territory Plan on time and submission of the final version with incorrect calculations. Continental terminated Ross's employment on July 19, 2012, in a teleconference with Ross's attorney. The decision to terminate Ross was made by Sicking, Gilhuly, Sean McDermaid, the National Sales Manager of the PLT Replacement Business Unit, and Alexander. Rick Ledsinger, the Vice President of Human Resources, approved the decision.

On August 7, 2012, Ross amended his Complaint in this action to assert FMLA retaliation and discrimination claims relating to his termination, as well as claims for wrongful discharge and fraud. On October 17, 2012, this Court dismissed with prejudice Ross's wrongful discharge and fraud claims. The following claims remain: (1) interference with FMLA rights against Gilhuly (Count I); (2) retaliation for taking FMLA leave against Gilhuly (Count II); and (3) retaliation for taking FMLA leave against Continental (Count III). On March 25, 2013, Gilhuly and Continental filed a motion for summary judgment as to all the remaining claims.

**DISCUSSION**

A motion for summary judgment shall be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court "must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh*, 418 F.3d at 267. To defeat a summary judgment motion, the non-moving party "must rely on

affidavits, depositions, answers to interrogatories, or admissions on file" to show there is a genuine issue of material fact. *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 199 (3d Cir. 2001) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The FMLA guarantees eligible employees 12 workweeks of leave during any 12-month period due to the birth of a child, a family member's serious health condition, the employee's own serious health condition, or other exigencies involving a family member's service in the armed forces. 29 U.S.C. § 2612(a)(1). Upon an employee's return from FMLA leave, the employer must restore the employee to the position he or she held when the leave commenced or an equivalent position with equivalent benefits and conditions of employment. *Id.* § 2614(a).

The FMLA also makes it unlawful "for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights. *Id.* § 2615(a)(1). Additionally, employers may not discriminate or retaliate against an employee based on the exercise of FMLA rights. *Id.* § 2615(a)(2); 29 C.F.R. § 825.220(c) (prohibiting employers from discriminating or retaliating against an employee for exercising or attempting to exercise FMLA rights); *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005) (distinguishing between "interference" and "discrimination" claims under the FMLA). Finally, employers may not retaliate against an employee for complaining about or participating in a proceeding concerning an employer's alleged violation of the FMLA. 29 U.S.C. § 2615(b).

To establish a claim for interference with FMLA rights, a plaintiff must show:

(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention

7

> to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Macioli v. Arby's Rest. Grp., Inc.,* 610 F. Supp. 2d 419, 429-30 (W.D. Pa. 2009) (citing *Lombardo v. Air Prods. & Chems., Inc.*, No. 06-1120, 2006 WL 2547916, at *11 (E.D. Pa. July 7, 2006)).

Ross alleges Gilhuly interfered with his FMLA leave by failing to conclude the initial PIP in January 2012 and adding the PIP Addendum upon his return to work. Ross claims when Defendants became aware of his illness and his need to take medical leave they began to "backtrack" on the 90-day end date for the PIP. Ross cites to a December 2011 email sent by Gilhuly stating that because of Ross's surgery, "we should consider pushing the PIP timetable by at least 30 days," as evidence of Gilhuly's interference with Ross's FMLA leave. Pl's. Mem. in Opp'n to Defs.' Mot. for Summ. J. Ex. J. This email, however, does not in any way show FMLA interference. In order to maintain his interference claim, Ross must show he was denied benefits to which he was entitled under the FMLA. *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006). Here, Ross requested FMLA leave, and the leave was approved. He received his salary and insurance benefits while on leave and upon his return. Finally, when Ross returned to work, he held the same ADM3 position he had before he left. When asked at his deposition if he felt he had received all the benefits, in terms of pay, to which he was entitled to during his leave, Ross responded "yes." Defs.' Mot. for Summ. J. Ex. H, at 202. When asked if there was any benefit he felt he was entitled to receive but did not get, he responded "no." *Id.*

Ross argues the Defendants interfered with his FMLA rights by using his leave as a negative factor in deciding to implement the PIP Addendum which ultimately led to his

termination.[3] Ross cites to *Lichtenstein v. University of Pittsburgh Medical Center* to support his argument that the PIP Addendum and subsequent termination amounted to interference with his FMLA rights. 691 F.3d 294, 301 (3d Cir. 2012). This case notes that interference and retaliation claims are often closely intertwined, and under the U.S. Department of Labor's regulations interpreting 29 U.S.C. § 2615(a)(1) & (2), employers are not allowed to consider FMLA leave as a negative factor in employment actions such as hiring, promotions, or disciplinary actions. *Id*; 29 C.F.R. § 825.220; *see also Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) ("[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee."). In both *Lichtenstein* and *Erdman* however, the interference claims at issue concerned a request for FMLA leave that was subsequently denied. These cases are thus factually distinct from this case, as Ross requested, was granted, and took FMLA leave. This aspect of Ross's his interference claim is therefore more properly characterized as a claim that Gilhuly and Continental retaliated against him for invoking his FMLA rights. Consequently, a reasonable trier of fact could not find Continental or Gilhuly interfered with Ross's FMLA rights, and they are therefore entitled to summary judgment on the interference claim.

Next, Ross alleges Defendants retaliated against him for taking FMLA leave. Courts analyze FMLA retaliation claims under the burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this analysis, Ross must first establish a prima facie case of FMLA retaliation by showing: (1) he exercised his rights under the FMLA; (2) he

---

[3] Ross's interference claim is alleged solely against Gilhuly. However, Ross appears to allege Continental conspired with Gilhuly to interfere with his leave. Insofar as Ross alleges interference by Continental, the record does not support this claim.

suffered an adverse employment action; and (3) the adverse employment action was causally related to the exercise of his FMLA rights. *Erdman,* 582 F.3d at 508-09.

It is undisputed Ross exercised his rights under the FMLA by taking FMLA leave. In addition, Ross contends, and Continental does not dispute, that Ross suffered adverse employment actions by virtue of the implementation of the PIP Addendum, and his termination. The parties dispute, however, whether Ross has shown one or both of these actions to be causally related to his exercise of FMLA rights. To demonstrate causation in an FMLA retaliation action, the employee must point to evidence sufficient to create an inference that a causal link exists between the FMLA leave and the adverse employment action. 29 U.S.C. § 2615(a)(2); *Lichtenstein,* 691 F.3d at 307.

Ross argues the extension of his PIP via the PIP Addendum, was retaliatory. Ross attempts to show the PIP Addendum was causally related to his FMLA leave by pointing to the fact that Gilhuly criticized him for being unprepared to hold a customer meeting 14 days after returning from FMLA leave, and then placed him on the PIP Addendum 24 days after he returned from leave. Ross claims he believed the PIP concluded before he went on leave, and points to the brief period of time he was back at work before receiving negative feedback and the PIP Addendum as evidence of retaliatory intent. Temporal proximity alone can be sufficient to establish a causal link, but "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (quotation omitted); *accord Walker v. Independence Blue Cross*, No. 03-6396, 2005 WL 1266590, at *7 (E.D. Pa. May 27, 2005) (applying "unusually suggestive" timing standard to an FMLA retaliation claim). Based on the prior implementation and continuation of the PIP, there was nothing unusually suggestive about

the PIP Addendum. *See Smith v. Mem'l Hosp. Corp.*, 302 F.3d 827, 834 (8th Cir. 2002) (noting evidence that an employer was concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity).

The record shows Ross's PIP had not been concluded prior to his FMLA leave and remained in effect upon his return to work. Where an employee's performance issues began and were recognized prior to engaging in protected activity, no retaliatory inference arises. *Zsenyuk v. City of Carson*, 99 F. App'x 794, 796 (9th Cir. 2004); *Helfrich v. Leigh Valley Hosp.*, No. 03-5793, 2005 WL 670299, at *20 (E.D. Pa. Mar. 18, 2005); *see also Shaner v. Synthes*, 204 F.3d 494, 504-05 (3d Cir. 2000) (finding plaintiff received negative evaluations before he engaged in protected activity and therefore could not establish a causal connection between his protected activity and alleged retaliation); *Cohen v. Austin*, 901 F. Supp. 945, 951 (E.D. Pa. 1995) (rejecting plaintiff's argument he was removed from his position in retaliation for claiming discrimination, because the record showed the plaintiff's employers were dissatisfied with his performance well before he raised the claim of discrimination). Any inference that the PIP Addendum was instituted for retaliatory purposes, based on its proximity to Ross's return from FMLA leave, is undercut by the fact the original PIP was instituted before there was ever any indication Ross would require FMLA leave.

Nor does the record as a whole support the inference that the Addendum was implemented because of Ross's FMLA leave. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) (noting that evidence looked at as a whole may raise an inference that the protected activity was the likely reason for the adverse employment action). To the contrary, the record overwhelmingly shows the PIP had not concluded before Ross's FMLA leave. Ross was placed on the PIP 24 days before informing Continental of his illness. He is correct that the

PIP stated it would run for a minimum of 90 days. However, the PIP did not state it would terminate automatically. The PIP stated that at the end of 90 days, job performance would be reviewed, at which time Continental would determine whether additional action was necessary. Before his leave began, Ross sent Gilhuly an email dated December 23, 2011, stating he wanted to conclude the PIP on January 12, so it would not be "hanging over his head" while he was out on leave. There is nothing on the record indicating Continental agreed to this. At no point was Ross ever told the PIP would terminate automatically; he was not told at the end of the 90-day period the PIP had in fact concluded, nor was there a final review meeting. Moreover, to his argument that he believed the PIP had concluded, Ross sent two emails in February, while he was out on leave, asking about the status of his PIP. Gilhuly responded to these emails by stating Ross's PIP status could not be changed or addressed until he returned to work full time. Finally, Ross testified during his deposition that while he was on leave his PIP was "pending" and when he returned on March 19, its status was "to be determined." Defs.' Mot. for Summ. J. Ex. H, at 205, 213.

The record thus establishes the PIP had not concluded before Ross went on leave and that Ross was aware it had not concluded. The only case law Ross cites to support his argument that implementation of the PIP Addendum in close proximity to his return from FMLA leave supports an inference of retaliation is *Brock-Chapman v. National Care Network, LLC*, No. 10-454, 2013 WL 169177 (N.D. Tex. Jan. 16, 2013). This case is easily distinguishable from the facts at issue here. In *Brock-Chapman,* the employer placed the employee on a PIP for the first time one month after her return from FMLA leave. As described above, Ross's PIP Addendum was not a new action, but a continuation of the previous action put in place before Continental was ever aware of Ross's illness and intention to take FMLA leave. Therefore, his claim that his

PIP had concluded and the Addendum was created in retaliation for taking FMLA leave is without merit.

Ross further alleges, as evidence of retaliation, that there was no written indication of negative performance from October 12, 2011, to November 29, 2011, such that discussion of extending his PIP began only after Ross informed Defendants of his health issues. Ross is partially correct, in that discussion of extending the PIP did not begin until after he informed Continental of his illness, and there was no written negative feedback given to Ross during that time period. However, to the extent that this is true, there must still be evidence of retaliatory intent by Continental and Gilhuly for Ross to succeed on his retaliation claim. *Lichtenstein*, 691 F.3d at 302 (observing that FMLA retaliation claims require proof of the employer's retaliatory intent); *see also Kachmar*, 109 F.3d at 178 (noting the element of causation is highly context specific as it involves an inquiry into the motives of an employer). Ross points to this lack of negative written feedback as evidence of retaliatory intent, such that the lack of negative feedback created an inference he had met the goals of the PIP. While the record shows Ross did not receive much written feedback regarding his progress, the PIP contained no requirement for Gilhuly to provide such written feedback. The record demonstrated that Gilhuly provided feedback in the form of face-to-face or telephone interactions, rather than formal write-ups. Gilhuly advised Ross on November 29, that he "would like to accompany [Ross] to the meeting with Jack Williams and have time to meet so that [Gilhuly] can provide you with feedback on the PIP." Defs.' Mot. for Summ. J., Ex. W. In the December 5, email to Alexander, Gilhuly stated he "met with Ron last week to review PIP progress," and that while "Ron [had] definitely made progress on most of the areas identified in the PIP" there was "still work to be done." *Id*. Additionally, Ross testified at his deposition that he communicated with Gilhuly frequently,

13

speaking with him two to three times a week about many work related things, including his PIP. *Id,* at Ex. H, at 186. Insofar as Ross was provided feedback, the evidence in the record suggests that Ross was making progress, but had not yet reached the goals necessary to conclude the PIP. Therefore, the lack of written negative feedback does not support Ross's argument that the PIP had concluded prior to his leave, and Continental's extension of the PIP was retaliatory.

An examination of the record further demonstrates Continental's lack of retaliatory intent. Discussion of Ross's performance deficiencies began in the summer of 2011, resulting in the August 2011 negative performance review. Gilhuly told Ross in September he would be receiving a negative review, and on October 12 Ross received the review with a "does not meet expectations" rating. Ross was subsequently placed on the PIP in an effort to rehabilitate his performance. Ross informed Continental of his illness on November 6 and advised the company of his need for FMLA leave on December 19. The record establishes Defendants extended the PIP to accommodate Ross's health concerns and allow him additional time to meet the goals he had not yet met. This is clear from Alexander's December 5 email to Gilhuly, Powell, Charity, and Sicking stating how the company would do everything it could to support Ross, including adjusting the timetable of his PIP. Gilhuly's December 6 response stated he would have no problems with adjusting the PIP timetable in order to give Ross more time to deal with his health issues. Subsequent emails between Gilhuly and HR further illustrate Continental sought to set up a new end date for Ross's PIP. This new schedule resulted in the PIP Addendum in April 2012, to provide Ross with the time to learn the programs introduced while he was on leave, before rendering a final performance evaluation. Thus, while the extension of Ross's PIP was related to his FMLA leave, there is no evidence of any retaliatory intent.

Ross also maintains his termination was in retaliation for taking FMLA leave, but has failed to establish any causal connection between his FMLA leave and his termination. In the 12-page July 19 PIP review memo, Gilhuly lists the reasons Ross was initially placed on the PIP, lists the performance goals Ross was expected to meet, and evaluates his performance based on those goals both before and after his medical leave. The memo includes the following observations and conclusions:

- Ross was instructed to follow up and visit direct customers in his territory more frequently, which he did for certain customers, but at least five dealers received one or no visits.
- Ross failed to improve his working relationship with Rich Betz of Reliable Tire to the point where Betz was willing to meet with Ross without Gilhuly present.
- Ross demonstrated a lack of proficiency in communicating the financial payouts associated with Continental's annual and quarterly programs.
- Ross demonstrated a lack of urgency in meeting with customers and pushing the new programs.
- Ross failed to utilize reporting tools available to him.
- Ross's 2012 Territory Plan contained incorrect calculations, did not follow instructions in certain areas, and did not include certain information that had been requested.
- Ross did not treat his 2012 Territory Plan with any urgency, and the final version submitted on July 6 contained incorrect calculations.
- Ross failed to adequately prepare for a June 21 meeting with Reliable Tire, ignoring instructions from Gilhuly about the necessary preparation.

15

- Ross demonstrated an unwillingness to show initiative and set up meetings with important customers like Reliable Tire and Jack Williams Tire, without suggestions or reminders.
- Ross continued to be unable to prepare for meetings independently, as done by other ADM3s.

Defs.' Mot. for Summ. J. Ex. X. Additionally, Gilhuly noted that the key area of concern in the April 2012 PIP Addendum was Ross's ability to effectively communicate key customer programs. This was an ongoing concern, which had not changed since the initiation of the PIP the previous October; however, the programs had changed, and Gilhuly provided Ross an additional 60 days to familiarize himself with the new programs before performing a final evaluation. The record, particularly the July 19 memo, clearly shows Ross was terminated based on performance deficiencies present before he took FMLA leave, which he failed to remedy upon his return to work. *See Cohen*, 901 F. Supp. at 951 (rejecting retaliation claim because employee was put on notice of performance deficiencies before engaging in protected activity, and was terminated based his inability to meet the job's requirements). Prior to the implementation of the PIP, Ross had prepared his own six month plan of action that acknowledged certain deficiencies. Thus, it was clearly established Ross had performance deficiencies before he took FMLA leave, and those deficiencies served as the basis for Ross's termination. Accordingly, no reasonable trier of fact could find Ross has established a prima facie case of retaliation, and Defendants are entitled to summary judgment on this claim.[4]

Assuming Ross had established a prima facie case for retaliation, his claim would still fail under the *McDonnell Douglas* burden shifting framework, as he has been unable to

---

[4] As Ross has been unable to establish his interference or retaliation claims against Gilhuly it is unnecessary to determine whether Gilhuly qualifies as an employer under the FMLA.

demonstrate that Continental's proffered reasons for implementing the PIP Addendum and subsequent termination were pretextual. Where a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 n. 5 (3d Cir. 1998); *See also Conoshenti v. Pub. Serv. Elect. & Gas Co.*, 364 F.3d 135, 146-47 (3d Cir. 2004) (applying the *McDonnell Douglas* burden shifting framework to an FMLA retaliation case). Once a defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, the ultimate burden shifts back to the plaintiff to show the legitimate reasons offered by the defendant were pretext for discrimination. *Jones v. Sch. Dist. Of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).

A plaintiff may defeat a motion for summary judgment "by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perski*, 32 F.3d 759, 762 (3d Cir. 1994). Ross argues pretext is evident in the fact that Continental did not begin to discuss extending the PIP until after being informed of Ross's illness and intended leave. However, as discussed above, there is no evidence of retaliatory intent in Continental's decision to extend the PIP, and thus no evidence of pretext. The record clearly established Ross's ongoing performance deficiencies, and Ross has not produced any evidence establishing that exercising his rights under the FMLA played any part in Continental's employment actions. Accordingly, no reasonable trier of fact could find that Continental's proffered reasons for implementing the PIP Addendum and terminating Ross's employment were pretextual. Thus, even if Ross could

establish a prima facie case of retaliation, Defendants are entitled to summary judgment on this claim.

An appropriate order follows.

BY THE COURT:


　　/s/ Juan R. Sánchez
Juan R. Sánchez, J.